IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DEC 2 0 2007

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

MARCUS HESSE, Guardian of      )
JOSEF HESSE, et al.            )
                              )
          Plaintiffs,          )
                              )
     v.                        )      No. 1:07cv603 (LMB)
                              )
CHARLES STEPHEN EBBETS, et al. )
                              )
          Defendants.          )

## MEMORANDUM OPINION

In this personal injury action, the plaintiffs seek to

impose liability on the defendant Long and Foster Realty, Inc.

("Long and Foster"), for an automobile accident allegedly caused

by the defendant Charles Stephen Ebbets.  They contend that, at

the time of the accident, Ebbets was acting as an employee of

Long and Foster, rendering Long and Foster responsible under a

theory of respondeat superior.  The parties have filed cross

motions for summary judgment on this issue.  For the reasons

stated in open court as amplified in this memorandum opinion, the

Court has granted Long and Foster's motion for summary judgment

and denied the plaintiffs' motions for summary judgment.[1]

## Background

The parties do not dispute that on July 23, 2005 at around

---

[1] This memorandum opinion addresses only the issue of
respondeat superior.  The plaintiffs also moved for summary
judgment with respect to the liability of Ebbets.  As explained
in open court, the Court denied that motion, as there are
material issues of fact in dispute.

10:30 a.m. in Fauquier County, defendant Ebbets, a real estate salesman, was driving north on Route 688 in his Cadillac DeVille sedan. He had just visited one of his property listings and, after noticing that the "for sale" sign and information box were missing, decided to drive to Long and Foster's Warrenton office to collect replacements. While attempting to cross the intersection of Route 688 and Route 55, Ebbets's car hit a motorcycle, critically injuring the driver, Josef Hesse, and his wife, Doerte Hesse, who was riding as a passenger. At the time of the accident, Ebbets was a highly successful, long-time associate with Long and Foster, selling real estate under a "Broker-Associate Independent Contractor Agreement."

Both Josef Hesse and Doerte Hesse are presently incapacitated. Their guardians have brought this personal injury suit on their behalf.[2]

## Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in

---

[2] On September 14, 2007, Marcus Hesse and Horst Schwinn were appointed to act as guardians ad litem for Josef Hesse and Doerte Hesse, respectively

-2-

his or her favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The parties have stipulated that there are no issues of fact in dispute regarding Ebbets's contractual relationship with Long and Foster.  Having thoroughly reviewed the parties' exhibits and deposition transcripts, the Court agrees with this characterization of the evidence.  The only question is whether, in light of the undisputed evidence, Ebbets was acting as an employee or as an independent contractor of Long and Foster.

### Discussion

To impose liability on Long and Foster, plaintiffs must show that Ebbets was functioning as an employee, and not as an independent contractor, when he engaged in his allegedly negligent conduct.  Virginia looks to the following factors to distinguish an independent contractor from an employee: "(1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power to control the work of the individual."  McDonald v. Hampton Training Sch. for Nurses, 486 S.E.2d 299, 301 (Va. 1997).  Of the four factors, "the power to control" is determinative.  Id.

Plaintiffs offer two arguments to support their position that Ebbets was a Long and Foster employee.  First, they broadly contend that under Virginia law real estate salespersons are always "employees" of their real estate broker.  Second, they

-3-

argue that Ebbets was an employee based on the specific characteristics of his relationship with Long and Foster.

   1.  Virginia Law Governing Real Estate Salespersons

   Under Virginia law, an individual or entity that sells, buys, or negotiates the purchase or sale of real estate is a "real estate broker."  Va. Code. § 54.1-2100.  A "real estate salesperson" has an identical function, except he must first affiliate with a broker before engaging in his profession.  See § 54.1-2101.  Both positions require licenses from the Virginia Real Estate Board.  See § 54.1-2106.1(B),(C).

   Various regulatory obligations inure to each party once a broker-salesperson relationship is consummated.  To avoid a conflict of interest, the salesperson must not accept compensation from any broker other than his principal broker, nor act as an agent for a client outside his broker's firm.  See 18 Va. Admin. Code §§ 135-20-270, 135-20-280(2).  The salesperson must also identify the name of the licensed broker with whom he is associated on all advertisements.  §§ 135-20-190, 135-20-290(4).

   In turn, the licensed broker must "exercise reasonable and adequate supervision of the provision of real estate brokerage services by . . . salespersons."  § 135-20-160(D).  The broker must also provide guidance on the handing of escrow deposits, compliance with state and federal laws, negotiation and drafting

-4-

of contracts, mandatory disclosures of the conditions of property, and advertising.  Id.  Finally, Virginia has adopted extensive regulations concerning escrow accounts and financial records.  The broker must maintain, and the salesperson must utilize, escrow accounts for deposits and down payments in real estate transactions.  § 135-20-180.  The broker must also possess a complete record of financial transactions conducted by his firm.  § 135-20-185.

Plaintiffs repeatedly invoke these statutory provisions to show Long and Foster's authority to control Ebbets. Specifically, plaintiffs argue that because Virginia law vests a broker with these legal responsibilities for its salespersons, its salespersons are a fortiori employees of their broker.

Plaintiffs' argument fails to address the statutory definition of "real estate salesperson," which explicitly includes "independent contractor":

> [A]ny person, or business entity of not more than two
> persons . . . who for compensation or valuable
> consideration is employed either directly or indirectly
> by, or affiliated as an independent contractor with, a
> real estate broker, to sell or offer to sell, or to buy
> or offer to buy, or to negotiate the purchase, sale or
> exchange of real estate, or to lease, rent or offer for
> rent any real estate, or to negotiate leases thereof,
> or of the improvements thereon.

Va. Code § 54.1-2101 (emphasis added).  The Virginia Real Estate Board employs this distinction in its regulations as well.  See, e.g., 18 Va. Admin. Code § 135-20-10.  Given the clear meaning of

-5-

the term "independent contractor" in modern legal parlance, the Court must presume that the use of the term in the statute demonstrates the Virginia General Assembly's endorsement of the employee/independent-contractor distinction in the real estate profession. Acceptance of plaintiffs' position would read the phrase "affiliated as an independent contractor" out of the statute.

Second, plaintiffs conflate the duty of supervision with the power to control. Although Long and Foster had a general duty to ensure that its salespersons complied with statutory and administrative regulations under the Virginia statutory scheme, these statutory requirements and administrative regulations do not implicate "the means and method of performing the work." McDonald, 486 S.E.2d at 301. They do not dictate the nature of the salesperson's relationship with his broker, only that he may associate with one broker. They do not control the specific content of a salesperson's advertising other than requiring that the salesperson identify his affiliated broker. They do not fix the percentage of the commission, regulating only how it is to be transmitted after the contract is finalized.

Contrary to plaintiffs' suggestion, the Virginia statutory scheme does not create a de facto master-servant relationship between a real estate broker and a salesperson. Instead, these regulations set out broad boundaries within which salespersons

-6-

may operate and place the onus on the brokers to ensure
compliance.  They do not, however, implicate the time, place, and
manner in which a salesperson may solicit buyers, negotiate a
deal, or execute an agreement.  Whether a particular salesperson
is an employee of a broker or affiliated as an independent
contractor turns on the unique circumstances of the salesperson's
relationship with his broker.

    2.  Ebbets's Written Contract With Long and Foster

    The Virginia Supreme Court has offered the following
guidance on the "power to control" inquiry:

> [T]he rule of respondeat superior rests on the power of
> control and direction, which must be as proprietor, in
> the sense of stopping the work or of continuing it, and
> determining the way it shall be done, with reference to
> the method of reaching the result, and not merely the
> result to be reached . . . .

Coker v. Gunter, 63 S.E.2d 15, 16 (Va. 1951); see also Norfolk &
W. Railroad Co. v. Johnson, 154 S.E.2d 134, 136 (Va. 1967)
("[T]he crucial question is whether the Railroad had the right to
control not merely results but the progress and details of the
work.").  The employing party need not have actually exercised
this control, so long as it retained the discretion to do so.
See McDonald, 486 S.E.2d at 301.

    To ascertain the relationship between Long and Foster and
Ebbets, the Court must "examine the written contract between the
parties and the evidence concerning performance under that
contract."  Richmond Newspapers, Inc. v. Gill, 294 S.E.2d 840,

-7-

843 (Va. 1982). When these sources are considered, the Court easily concludes that Ebbets was acting as an independent contractor on the day in question.

The title of the contract, "Broker-Associate Independent Contractor Agreement," clearly demonstrates that the intent of the parties was to establish an independent contractor rather than an employer/employee relationship.

Furthermore, Clause Five of the independent contractor agreement sets forth the limited extent of Long and Foster's control over how Ebbets was to perform his work:

> CERTAIN RESPONSIBILITIES. Associate agrees to work diligently and with his/her best efforts to sell, lease or rent any and all real estate listed with Broker in jurisdictions where Associate is licensed, to solicit additional listings, clients and customers for said Broker, and otherwise to serve the public in real estate transactions and to promote the mutual benefit of the parties. . . . Associate shall not, however, be required to maintain any fixed schedule or minimum number of hours of work; while Associate shall not be required to attend any sales training or similar meetings, Associate is encouraged to do so in order for Associate to maintain his/her professional competency.

The import of the provision is clear. Long and Foster had <u>no authority</u> to control Ebbets' schedule, to insist that he carry a minimum workload, or to command his presence at company meetings. Rather, it could only demand his best efforts to solicit listings, clients, and contracts – <u>i.e.</u>, the end product. This hands-off association is the <u>sine qua non</u> of an independent contractor relationship.

-8-

When pressed to explain this language at oral argument, counsel for plaintiff Josef Hesse repeatedly insisted that Long and Foster could alter its Policy Manual at a whim and demand Ebbets' participation at meetings, insist on his presence at the office, and mandate that he perform minimum monthly hours or sales.[3]  This position ignores Clause Eighteen of Ebbets's contract, which explicitly identifies the contract, not the Policy Manual, as the document governing Ebbets's obligation and states that any conflict between the contract and the Policy Manual shall be resolved in favor of the contract.[4]  An attempt by Long and Foster to mandate that Ebbets accept a fixed work schedule would violate the clear language of Clause Five.

Finally, the contract contains broad indemnification provisions in Clauses Nine and Thirteen.  In a traditional master-servant relationship, the master indemnifies the servant for any action taken on his behalf.  See Restatement (Second) Torts § 886B(2)(b).  Put succinctly, the master accepts liability in exchange for his power to control.  However, Long and Foster's relationship with Ebbets presents the opposite scenario.  Under

---

[3] The Policy Manual's provisions, which are binding on salespersons, are "subject to change in the overall best interests of Long & Foster."

[4] Clause Eighteen provides: "In the event there is any such conflict between said Long & Foster Real Estate, Inc., Policy Manual, written Company memoranda and this Agreement, then this Agreement shall control but only to the extent of any such conflict."

his contract, Ebbets agreed to indemnify Long and Foster for his conduct as a salesperson, explicitly including any liability arising out of Ebbets' operation of his vehicle.

A plain reading of these indemnification provisions with Clause Five shows that Long and Foster expressly disclaimed any power to control the means and manner in which Ebbets sold real estate and that Ebbets expressly granted broad indemnification to Long and Foster for the means and manner of his real estate sales.  The Court finds this circumstance to be strongly, if not conclusively, indicative of an independent contractor relationship

3.   Long and Foster's Policies and Practices

The Court's conclusion is confirmed by an examination of Long and Foster's policies and practices with respect to its salespersons, or "associates," at the time of the accident.  Each associate set his own hours.  Long and Foster did not require an associate's presence in the office, nor did it keep track of when he was in the office.  Brouwer Dep. 44; Ebbets Dep. 56.  Also, Long and Foster did not keep track of its associates' appointments schedules.  Brouwer Dep. 81-82.  The managing broker would conduct periodic informal reviews with his associates, but did not get involved in their day-to-day activities.  Brouwer Dep. 108, 115.

Long and Foster did not have rules or guidelines about the

-10-

display of properties or the solicitation of new customers.  Each individual associate could decide how to advertise properties and how to solicit clients.  Brouwer Dep. 19.  Unless pre-approval was secured from the managing broker, the associate was financially responsible for any work or improvements ordered on a property listing.  PM 30.

Associates generated their own listings.  Nash Dep. 13.  The seller and associate would negotiate the listing contracts.  Only at a later point in the process would the managing broker review the contract and sign it.  Nash Dep. 18-19.

Long and Foster did not issue work assignments to its associates.  Although some associates performed "desk duty," which involved handling general phone inquiries to the office, the desk duty was voluntary.  Nash Dep. 127.  Long and Foster did not restrict its associates to particular territories to avoid competition.  Brouwer Dep. 16; PM 28.

Long and Foster provided boilerplate forms drafted by the Northern Virginia Association of Relators in accordance with state and federal laws.  Brouwer Dep. 23-24, Nash Dep. 120-21.  Although associates were encouraged and/or instructed to use those forms to ensure compliance and efficiency, they could insert special modifications or contingencies when necessary.  Brouwer Dep. 132-33; Nash Dep. 22-23, 121.  Long and Foster would review all contracts to ensure that the required information was

-11-

present.  Brouwer Dep. 23; Nash Dep. 20.

Although Long and Foster provided associates with "for sale"
signs, which displayed the associate's name and "Long and
Foster," the associates bore the sole responsibility of
maintaining these signs and any brochure boxes placed on their
properties.  Brouwer Dep. 77-78.  Associates were free to
contract with third parties to perform these services.  Brouwer
Dep. 80; Ebbets Dep. 125-26.  The decision to use a lock box was
left to the associate, who was responsible for purchasing or
leasing it.  Brouwer Dep. 91; PM 30.

An associate could take out individual advertisements in
local newspapers and magazines, so long as he identified his
affiliation with Long and Foster as his licensed broker.  Brouwer
Dep. 110, 112.  Long and Foster retained the right to review this
advertising.  PM 29.

Associates used their own vehicles to conduct business.
Ebbets Dep. 100.  Company policy (and the associate's contract)
required that an associate keep a minimum liability policy of
$250,000 per person, $500,000 per accident.  PM 9.

Although Long and Foster established minimum commissions for
real estate transactions, PM 39, in practice, managers allowed
associates to negotiate their own commission rates for each
listing.  Brouwer Dep. 22; Nash Dep. 75; Ebbets Dep. 113.  Long
and Foster then took a percentage of that commission as set out

-12-

in the Commission Schedule.  It did not award any other
compensation or bonuses, Nash Dep. 37.

Under Ebbets' contract, either party could terminate the
relationship at any time by written notice.  If Ebbets's
affliation with Long and Foster ended, his license would be
returned to the Virginia Real Estate Board, which could then
reassign it to another licensed broker.  Nash Dep. 29.  His sales
contracts would remain with Long and Foster, but he would receive
his full commission.  Nash Dep. 38.

Each associate could maintain an expense account with Long
and Foster for advertising, expenses, and errors and omissions
insurance.  Brouwer Dep. 95.  However, he could also purchase
these items directly.  Id.  If expenses were billed to the
expense account, Long and Foster would deduct the amount from the
associate's commission.[5]  Nash Dep. 110.

As a matter of state law, associates were required to attend
continuing education courses.  Although Long and Foster made such
courses available, it did not mandate them.  An associate could
register for any company's course, so long as it was state
approved.  Nash Dep. 41.  Also, Long and Foster charged a fee to
its associates to attend its seminars.  Nash Dep. 42.  It did not
keep track of its associates' hours.  Brouwer Dep. 40-41.

---

[5] Long and Foster did reimburse its associates for certain
expenses – postage, long distance telephone calls, tuition for
license, and customer gifts under $5.  See Policy Manual 46.

-13-

Long and Foster offered associates the ability to use its internet site and a company email address, however, associates were permitted to use third party websites instead, and many did. Brouwer Dep. 31.

Although Long and Foster retained some control over the working conditions of its associates, much of which was mandated by state law, its associates retained substantial authority to conduct their sales activities – to choose their work hours, to select their clients, to generate their listings, to display their properties, to advertise their services, and to close deals.[6]  Long and Foster reviewed their contracts to ensure compliance with state law and company policies, but it had almost no involvement in the day-to-day work of its salespersons.

Plaintiffs' repeated hypotheticals about how Long and Foster might revise its policies in the future to demand greater control over its salespersons are unhelpful.  Although the Long and Foster policy manual was subject to revision at any time, the Court must examine the policies and practices in existence at the time of the accident.  See Coker, 63 S.E.2d at 16 ("The answer, as we shall see, is to be found by ascertaining which one had the power of control over Minggia at the time of the accident.")

---

[6] Of particular note, "associates are free to farm any area they wish."  PM 28.  If it had the "power to control" its associates' affairs, as plaintiffs contend, one would expect a more centralized effort by Long and Foster to coordinate its associates' efforts.

-14-

(emphasis added).

Plaintiffs' other citations to Long and Foster policies in effect at the time of the accident are not persuasive. Those policies are, at best, tangential to the work of a salesperson or are taken out of context. For example, plaintiffs repeatedly highlight company policies that prohibited associates from conducting real estate business for another broker and required them to identify "Long and Foster" in advertisements. As discussed above, Virginia law requires salespersons to affiliate with a licensed broker when conducting their affairs and identify that affiliation. These Long and Foster policies simply define who Ebbets can work for, but say nothing about the time, place, and manner in which he conducts his business. With respect to the advertising policies, there is no evidence in the record to show that Long and Foster ever exercised any control beyond ensuring that its name and logo were properly displayed.

Plaintiffs also argue that Long and Foster required its associates to carry errors and omissions insurance and auto insurance, to dress appropriately, and to not use alcohol or drugs in the work place. The Court does not find that these policies materially constrain the manner in which an agent conducts his business other than to impose minimum standards of conduct that are generally accepted in any professional

environment, not unique to the real estate field.[7]

Plaintiffs also emphasize that salespersons were expected or instructed to use stock forms when drafting their listing and sales contracts.  Again, plaintiffs fail to explain how, through these forms, Long and Foster controlled its associates' activities.  The forms provided boilerplate language, designed to ensure that the contract complied with applicable laws and contained all the essential terms of a contract.  It is undisputed that agents retained authority to insert modifications or contingencies.  See Nash Dep. 121.

Finally, at oral argument and in his brief, counsel for Doerte Hesse recited a long list of Long and Foster policies relating to its salespersons' use of the company-provided office, phones, copiers, computers, etc., which require, for example, the salesperson to document his presence after normal business hours, turn off the lights upon leaving the office, accurately transfer phone calls, avoid parking in spots frequented by customers, and limit personal phone calls.  Counsel also emphasized Long and Foster's right to monitor associates' emails and internet

---

[7] In a similar vein, plaintiffs highlight Long and Foster's policy of preventing telephone solicitations before 8 a.m. or after 9 p.m., prohibiting the use of automatic dialing systems, and requiring each office to maintain a "Do Not Call" list.  See PM 16.  These policies were enacted to comply with the basic requirements of the Telephone Consumer Protection Act, see 47 U.S.C. § 227, and do not materially constrain the work of a salesperson.

activity when using their <longandfoster.com> accounts.

These policies do not advance the plaintiffs' position because Long and Foster did not require associates to use the services and tools to which they applied.  In other words, use of Long and Foster's office, computer, and phones was optional.  If an associate chose to use the computer, he had to follow the rules.  That Long and Foster retained the power to control these services does not mean that it also retained the power to control the associate.

The "power to control" inquiry looks not at the product of the salesperson's work, but whether the company controlled the manner of the work.  When the record is viewed in its entirety, it is abundantly clear that "the time, means and method of doing [the work] were under [the] exclusive control" of the agents.  Coker, 63 S.E. 2d at 755.  For these reasons, the Court has concluded that at the time of this very tragic accident, Ebbets was not acting as an employee of Long and Foster and, therefore, Long and Foster has no liability for his conduct.

## Request for Interlocutory Appeal

Plaintiffs have orally requested that the Court certify its summary judgment ruling for interlocutory appeal.  Long and Foster has filed a motion opposing that request.  The Court will deny plaintiffs' request because resolution of the question of respondeat superior is not "a controlling question of law" whose

-17-

resolution would "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(c). Ebbets contests liability and the amount of damages, and the outcome of either could moot the need for an appeal. Furthermore, the Court sees no basis for finding a "substantial ground for a difference of opinion" on the legal principles discussed in this opinion.[8] Id.

### Outstanding Discovery and Trial Issues

The Court is well aware of the difficulties incurred by all parties in fixing the magnitude of plaintiffs' injuries. Plaintiffs, who are significantly impaired, are presently in Germany and under the care of German doctors. Many of their medical records are in German. These circumstances will require the remaining parties to expend significant time and money in arranging for foreign depositions and in locating medical experts who can faithfully translate plaintiffs' records.

The Court also recognizes the need for prompt adjudication of the liability issue. Nearly two and one-half years have passed since the accident, and both parties are relying on live testimony to advance their theories of the case.

For these reasons, the Court will, in its discretion, bifurcate the proceedings. All discovery on damages will cease.

---

[8] For similar reasons, the Court exercises its discretion and refuses to direct entry of final judgment under Fed. R. Civ. P. 54(b) as to Long and Foster. See Cantor v. Cohen, 442 F.3d 196, 198 (4th Cir. 2006) (emphasizing the district court's discretion in issuing certifications under Rule 54(b)).

Instead, the Court will set a prompt jury trial on the issue of liability.  If the jury finds in favor of the plaintiffs, the Court will allow a brief period for settlement efforts.  If the parties are unable to settle, discovery on the damages issue will be reopened, and a trial solely on the issue of damages will then be scheduled.

A separate order consisted with this opinion will be entered.

Entered this 20 day of December, 2007.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia